ACCEPTED
03-15-00063-CR
4835037
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/9/2015 5:27:50 PM
JEFFREY D. KYLE
CLERK

## NO. 03-15-00063-CR

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
4/9/2015 5:27:50 PM
JEFFREY D. KYLE
Clerk

## EX PARTE JAMES RICHARD "RICK" PERRY

ON APPEAL FROM THE 390TH JUDICIAL DISTRICT COURT,
TRAVIS COUNTY, TEXAS, CAUSE NO. D-1-DC-14-100139

## APPELLANT'S REPLY BRIEF

THE BUZBEE LAW FIRM
Anthony G. Buzbee
State Bar No. 24001820
JPMorgan Chase Tower
600 Travis Street, Suite 7300
Houston, Texas 77002
Tbuzbee@txattorneys.com
Telephone:  713.223.5393
Facsimile:   713.223.5909

BOTSFORD & ROARK
David L. Botsford
State Bar No. 02687950
1307 West Avenue
Austin, Texas 78701
dbotsford@aol.com
Telephone:  512.479.8030
Facsimile:   512.479.8040

BAKER BOTTS L.L.P.
Thomas R. Phillips
State Bar No. 00000102
San Jacinto Center
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701-4078
tom.phillips@bakerbotts.com
Telephone:  512.322.2565
Facsimile:   512.322.8363

TABLE OF CONTENTS

**Page**

INDEX OF AUTHORITIES...................................................................................... iii

ARGUMENT .........................................................................................................1

I.     Reply to the State's Arguments Regarding the Facial Unconstitutionality of the Coercion Statute. ........................................ 1

II.    Reply to the State's Arguments Regarding Governor Perry's First Amendment Protections. ...................................................... 5

III.    Reply to the State's Arguments that the Legislature Can Limit the Speech of Its Own Members. ................................................ 8

IV.    Reply to the State's Arguments that the Face of the Statute Is Not Overbroad. ........................................................................ 10

V.    Reply to the State's Arguments On Strict Scrutiny Review. ............. 12

VI.    Reply to the State's Arguments Regarding "Least Restrictive Means" of Serving a Compelling State Interest. ............................... 13

VII.    Reply to the State's Arguments on Facial Vagueness. ...................... 15

VIII.    Reply to the State's Arguments on the Cognizability of Governor Perry's Constitutional Arguments. ..................................... 18

IX.    Reply to the State's Arguments Regarding Separation of Powers .... 22

X.    Reply to the State's Arguments on Speech or Debate and Absolute Legislative Immunity. ......................................................... 24

    A.    The State Mischaracterizes *Mutscher v. State* .......................... 24

    B.    Texas's Speech or Debate Clause Does Not Apply Only to Members of the Legislature ...................................................... 26

    C.    Governor Perry's Alleged Conduct Was All Legislative in Nature ................................................................................. 28

    D.    The State Misstates Federal Law Regarding the Effect of

Legislative Immunity ................................................................30

CONCLUSION ..................................................................................31

CERTIFICATE OF COMPLIANCE ......................................................34

CERTIFICATE OF SERVICE..............................................................34

ii

# INDEX OF AUTHORITIES

**Page(s)**

CASES

*Baraka v. McGreevey,*
481 F.3d 187 (3d Cir. 2007) ...............................................................................28

*Board v. State,*
No. 03-96-00024-CR, 1998 WL 271043 (Tex. App.—Austin May 29,
1998, pet. ref'd)...............................................................................................2, 3

*Bond v. Floyd,*
385 U.S. 116 (1966)...............................................................................................7

*Bowles v. Clipp,*
920 S.W.2d 752 (Tex. Civ. App.—Dallas 1996, writ denied) ...........................24

*Canfield v. Gresham,*
17 S.W. 390 (Tex. 1891)......................................................................................24

*Carey v. Brown,*
447 U.S. 455 (1980)...............................................................................................4

*Connick v. Myers,*
461 U.S. 138 (1983)...............................................................................................6

*Duncantell v. State,*
230 S.W.3d 835 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd)........2, 3, 10

*Emergency Network v. Bush,*
323 F.3d 937 (11th Cir. 2003) ............................................................................28

*Empress Casino Joliet Corp. v. Blagojevich,*
638 F.3d 519 (7th Cir. 2011) ..............................................................................28

*Ex parte Boetscher,*
812 S.W.2d 600 (Tex. Crim. App. 1991) ...........................................................18

*Ex parte Doster,*
303 S.W.3d 720 (Tex. Crim. App. 2010) ...........................................................20

*Ex parte Mattox*,
    683 S.W.2d 93 (Tex. App.—Austin 1984, pet. ref'd) ................................21, 22

*Ex parte Ragston*,
    402 S.W.3d 472 (Tex. App.—Houston [14th Dist.] 2013) ...............................20

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006)................................................................................................6

*Gravel v. United States*,
    408 U.S. 606 (1972).......................................................................................29, 31

*Helstoski v. Meanor*,
    442 U.S. 500 (1979)..............................................................................................19

*Hutchinson v. Proxmire*,
    443 U.S. 111 (1979)..............................................................................................29

*Imbler v. Pachtman*,
    424 U.S. 409 (1976)..............................................................................................31

*In re Perry*,
    60 S.W.3d 857 (Tex. 2001)...................................................................................27

*Jenevein v. Willing*,
    493 F.3d 551 (5th Cir. 2007) .................................................................................6

*Johanns v. Livestock Mktg. Ass'n*,
    544 U.S. 550 (2005).............................................................................................7, 8

*Jorgensen v. Blagojevich*,
    811 N.E.2d 652 (Ill. 2004)...................................................................................28

*Karenev v. State*,
    281 SW.3d 428 (Tex. Crim. App. 2008) ............................................................19

*Kilbourn v. Thompson*,
    103 U.S. 168 (1880)..............................................................................................24

*Mutscher v. State*,
    514 S.W.2d 905 (Tex. Crim. App. 1974) ...............................................24, 25, 26

iv

*N.A.A.C.P v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982)...................................................................................3, 4

*O'Shea v. Littleton*,
    414 U.S. 488 (1974)....................................................................................31

*Org. for a Better Austin v. Keefe*,
    402 U.S. 415 (1971).....................................................................................4, 9

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009).....................................................................................7, 8

*Puckett v. State*,
    801 S.W.2d 188 (Tex. App.—Houston [14th Dist.] 1990, pet. ref'd)..........1, 2, 3

*Saldano v. State*,
    70 S.W.3d 873 (Tex. Crim. App. 2002) ................................................................28

*Sanchez v. State*,
    995 S.W.2d 677 (Tex. Crim. App. 1999) .............................................................4

*State Emps. Bargaining Agent Coal. v. Rowland*,
    494 F.3d 71 (2d Cir. 2007) .......................................................................28

*State v. Hanson*,
    793 S.W.2d 270 (Tex. App.—Waco 1990, no pet.) .....................................15, 16

*State v. Holton*,
    997 A.2d 828 (Md. Ct. Spec. App. 2010).......................................................30

*Tenney v. Brandhove*,
    341 U.S. 367 (1951).................................................................................24

*Torres Rivera v. Calderon Serra*,
    412 F.3d 205 (1st Cir. 2005).....................................................................28

*United States v. Gillock*,
    445 U.S. 360 (1980)..................................................................................31

*United States v. Kozminski*,
    487 U.S. 931 (1988)..............................................................................13, 14

v

*United States v. Mandel,*
    415 F. Supp. 1025 (D. Md. 1976)............................................27, 28, 30

*United States v. Stevens*,
    559 U.S. 460 (2010).........................................................................11

*United States v. Williams*,
    553 U.S. 285 (2008)...........................................................................5

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008).........................................................................11

*Wood v. Georgia*,
    370 U.S. 375 (1962)...........................................................................6

**STATUTES**

Tex. Code Crim. Proc. art. 21.03 ...........................................................19

Tex. Penal Code § 1.07(a)(48).........................................................1, 17

**OTHER AUTHORITIES**

Tex. Const. art. IV, § 9...................................................................27, 29

Tex. Const. art. IV, § 14.................................................................27, 29

I.     **Reply to the State's Arguments Regarding the Facial Unconstitutionality of the Coercion Statute.[1]**

Instead of beginning its facial challenge with a textual analysis of Section 36.03(a)(1) and Section 1.07(a)(9)(F), as Governor Perry did in his brief, App.Br. at 17-22, the State leads with the truism that the First Amendment is not absolute.  St.Br. at 6.  Having shown that not every utterance is automatically protected, the State then claims that Governor Perry's speech was unprotected because it amounted to a "retaliatory act," "verbal extortion," or a "*quid pro quo* threat[] made under a display of authority and power."  *Id.* at 7.  But the text of the sections under challenge criminalizes far more than retaliation, extortion, and *quid pro quo* threats.  *See* App.Br. at 10-17.  Indeed, the constitutional issues of overbreadth (and also vagueness) arise only when Section 36.03(a)(1) is read, as it must be, in conjunction with Section 1.07(a)(9)(**F**); together, they do not require the "coercion" to be illegal, unlawful, tortious, or even a "true threat."[2]

The State's cases do not save these provisions.  Its main authority, *Puckett v. State*, 801 S.W.2d 188 (Tex. App.—Houston [14th Dist.] 1990, pet. ref'd),

---

[1] *See* State's Issue I(A) at 6-7, 14.

[2] Section 1.07(a)(9)(**F**) does not require the prohibited "threat" to be unlawful, and Section 36.03(a)(1) does not require the "coercion" to be unlawful.  Since the term "unlawful" is defined by the Penal Code to mean "criminal or tortious or both and includes what would be criminal or tortious but for a defense not amounting to justification or privilege," Tex. Penal Code § 1.07(a)(48), it necessarily follows that Section 36.03(a)(1), when read in conjunction with Section 1.07(a)(9)(**F**), covers any and all *conduct or speech* that can be construed as a "threat" if it otherwise meets the requirements of Section 36.03(a)(1).

1

addressed both facial and as-applied challenges to the more narrowly drawn retaliation statute, Section 36.06(a), by a defendant who "repeatedly stated in no uncertain terms that he would kill [the arresting officer] when he got out of jail." *Id*. at 194. The court said that "it is clear that these statements by [Puckett] could reasonably be interpreted" as a "true threat" reflecting an "intent to kill or injure," and hence not protected speech. *Id*. Similarly, *Board v. State*, No. 03-96-00024-CR, 1998 WL 271043 (Tex. App.—Austin May 29, 1998, pet. ref'd), involved a challenge to the tampering statute, Section 36.05, in conjunction with the narrower definition of "coercion" in Section 1.07(a)(9)(**D**), which criminalizes a threat "to expose a person to hatred, contempt or ridicule." Finally, the State points to *Duncantell v. State*, 230 S.W.3d 835 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd), which it says involves "the same type of unprotected conduct Section 36.03 regulates." St.Br. at 14. There, the court rejected an overbreadth challenge to the "interference with public duties" statute, Section 38.15(a)(1), after finding that the defendant engaged in *conduct* which he knew or should have known would interrupt, disrupt, impede, or interfere with a peace officer performing a duty imposed by law, "such as investigating an accident or arresting a criminal suspect." 230 S.W.3d at 844. That, the court held, "was *not* expressive conduct protected by the First Amendment." *Id*. (emphasis added). Importantly, the court specifically noted that Section 38.15(d) "provides that it is a defense to prosecution under the statute if the

2

interruption, disruption, impediment, or interference alleged *consists of speech only*." *Id*. at 843 (emphasis added). Accordingly, the court stated "we must only examine the interference statute's limitations on *conduct* to determine if it restricts a substantial amount of constitutionally protected *conduct*." *Id*. at 844-845 (emphasis added).

Governor Perry, of course, was indicted under a materially different provision of the Penal Code, Section 36.03(a)(1), in conjunction with the broader definition of "coercion" in Section 1.07(a)(9)(**F**). But even if *Puckett*, *Board*, and *Duncantell* supported the State's frighteningly narrow view of First Amendment protections, they would not bind this Court because they would be irreconcilable with the U.S. Supreme Court authority cited in Governor Perry's brief. App.Br. at 11-15. The State never acknowledges, let alone distinguishes, cases like *N.A.A.C.P v. Claiborne Hardware Co.*, 458 U.S. 886, 910 (1982), which explained that "speech does not lose its protected character . . . simply because it may embarrass others *or coerce them into action*." (Emphasis added). The facts of *Claiborne* are particularly instructive. There, a civil-rights boycott organizer warned that boycott breakers would be "disciplined," and that "if we catch any of you going into any of them racist stores, we're gonna break your damn neck." *Id*. at 902. While such statements "might have been understood as inviting an unlawful form of discipline or, at least, as intending to create a fear of violence," *id*. at 927, they still enjoyed First

3

Amendment protection because expression on public issues "has always rested on the highest rung of the hierarchy of First Amendment values." *Id.* at 913 (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)); *see also Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) ("The claim that . . . expressions were intended to exercise *a coercive impact* on respondent does not remove them from the reach of the First Amendment.  Petitioners plainly intended to influence respondent's conduct by their activities; *that is not fundamentally different from the function of a newspaper*." (emphasis added)).

The State then points to the language of *Sanchez v. State*, 995 S.W.2d 677, 687-88 (Tex. Crim. App. 1999), which noted that "verbal extortion 'has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money.'"  St.Br. at 7.  But *Sanchez*—a prosecution for official oppression by sexual harassment under Section 39.03(a)(3)—merely analogized sexual harassment by a public servant to official extortion and bribery on the ground that "the receipt of someone's submission to sexual conduct" was comparable to "the use of official power to obtain a benefit to which the official was not otherwise entitled" in the form of "money or tangible property." 995 S.W.2d at 688.[3]  Count II

---

[3] In *Sanchez*, the Court of Criminal Appeals commented that if the official oppression statute were to cover "conduct welcomed by the recipient in a corrupt bargain," then such conduct could also be prosecuted under the prostitution or bribery statutes.  995 S.W.2d at 675 n.5. Similarly, if there were any facts supporting the State's use of its colorful metaphors such as *quid pro quo*, extortion, or indirect benefits, then the State could have sought an indictment under statutes applicable to that type of conduct.

of the indictment does not allege extortion, bribery, or receipt of a personal benefit. More importantly, any such allegations would be irrelevant to Governor Perry's facial challenge because the plain language of Section 36.03(a)(1) and Section 1.07(a)(9)(**F**) extends far beyond extortionate threats or bribery.

## II. Reply to the State's Arguments Regarding Governor Perry's First Amendment Protections.[4]

The State also advances the novel claim that Governor Perry cannot make a facial overbreadth challenge to Section 36.03(a)(1) and Section 1.07(a)(9)(F) because, in exercising his official duties as Governor of Texas, he enjoyed no First Amendment rights. *See* St.Br. at 8-10. The State points to two recognized instances of prohibition: (1) certain government-employee speech, which is subject to no greater First Amendment protection than the speech of private employees; and (2) the concept of government speech itself. *Id.* But neither situation has *anything* to do with criminalizing speech, much less criminalizing an elected official's political speech through the mechanism of an overboard statute. Furthermore, because facial overbreadth analysis deals not with the statute as applied to the particular defendant, but whether "it prohibits a substantial amount of protected speech," *United States v. Williams*, 553 U.S. 285, 292 (2008), Governor Perry's own First Amendment rights are irrelevant to the resolution of his facial overbreadth challenge.

---

[4] *See* State's Issue I(B) at 8-10.

The State begins by pointing out that the First Amendment generally does not protect statements made by public servants in the course of their employment. St.Br. at 9 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 422 (2006)). But this employee-speech "exception" is not really an exception at all—it just makes unelected public servants, who are employees, subject to civil employment-law standards comparable to employees in the private sector. Just like a private employer, governmental entities "need a sufficient degree of control over their employees' words and actions" to ensure the "provision of public services." *Garcetti*, 547 U.S. at 418; *see also Connick v. Myers*, 461 U.S. 138, 143 (1983) ("[G]overnment offices could not function if every employment decision became a constitutional matter.").

The rights of those directly elected by the people, such as the Governor of Texas, are not so limited. Indeed, political speech by elected officials, whose "relationship with [their] employer [i.e., the people] differs from that of an ordinary state employee," "is at the core of the First Amendment." *Jenevein v. Willing*, 493 F.3d 551, 557 (5th Cir. 2007) (finding First Amendment violation by Texas judicial conduct commission when censuring elected judge for public criticism of attorney practicing in his court). "The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance." *Wood v. Georgia*, 370 U.S. 375, 395 (1962)

6

(reversing contempt conviction of elected sheriff based on criticism of court's grand jury investigation). The Supreme Court has expressly rejected the idea that the First Amendment protects only the "citizen-critic" and not elected officials as well. *Bond v. Floyd*, 385 U.S. 116, 136 (1966) (state legislature violated elected representative's First Amendment rights by refusing to seat him based on his controversial remarks about the Vietnam War).

The State also errs by characterizing Governor Perry's alleged threat as "government speech" exempt from the First Amendment—as if anything uttered by a government employee, or the Governor himself, can be criminalized without any First Amendment analysis at all. St.Br. at 8-9. The State's authorities for that bizarre and dangerous notion have nothing whatsoever to do with criminalizing speech. They merely acknowledge that the First Amendment generally allows the government to communicate its own particular viewpoints without subsidizing or promoting other viewpoints to the same extent as its own. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) (city could select which monuments to place in public park); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 561 (2005) (federal government could choose to spend money promoting beef consumption). These cases do not authorize the government to criminalize speech by government employees or anyone else, must less elected leaders.

Even if "government speech" did amount to a wholesale withdrawal of First

7

Amendment rights, Governor Perry's alleged threat is not the sort of officially-sanctioned "government speech" involved in the cases the State cites. His statements—which the State in its "bill of particulars" now asserts were never made directly to Lehmberg, *see* March 2, 2015 SuppCR at 6, and were allegedly "implied or disguised," *see* St.Br. at xvi—were not presented as the official viewpoint of the State of Texas. *Cf. Pleasant Grove*, 555 U.S. at 473-74 (city spoke through a Ten Commandments monument when it "took ownership of that monument and put it on permanent display in a park that it owns and manages and that is linked to the City's identity"); *Johanns*, 544 U.S. at 561 (beef promotion campaign was government speech because the activities were "prescribed by law in their general outline" and "developed under official government supervision"). The State wants to have it both ways: characterizing Governor Perry's alleged speech as the official position of the State while at the same time prosecuting him as an *individual* for expressing it.

## III. Reply to the State's Arguments that the Legislature Can Limit the Speech of Its Own Members.[5]

From its faulty premise that speech by government officials enjoys no First Amendment rights, the State then concludes that the Legislature can always limit the speech of its own members without running afoul of the First Amendment, even if that requires restricting some "incidental" *private* speech in the process. St.Br. at 10-11. The State argues that the specific statutory language at issue merely restricts

---

[5] *See* State's Issue I(C) at 10-11.

private speech in order to express the "viewpoint" that "official speech should not be coerced speech." *Id*.

The State's apparent argument is that Section 36.03(a)(1) and Section 1.07(a)(9)(F) express a government "viewpoint" and can therefore freely criminalize any private speech made with the intent to influence the speech (or conduct) of a public official, regardless of the words used, without further First Amendment concerns. Thus, under the State's argument, a newspaper editorial expressing the personal view of the editor, which was intended to pressure and have a "*coercive impact*" on a public servant, could be criminalized, even though the First Amendment clearly protects such speech. *Org. for a Better Austin*, 402 U.S. at 419 (emphasis added).

The State's argument also mistakenly assumes that the coercion statute "is the Texas Legislature regulating its own speech and actions." St.Br. at 11. But the State fails to account for the statutory exception of Section 36.03(c), which—far from regulating the Legislature's "own speech"—excludes from the purview of Section 36.03(a)(1) "official actions" taken by "a member of the governing body of a governmental entity" that are intended to influence another public servant. This exception reflects a legislative determination that "coercion" by one public servant against another public servant is not always or even necessarily a crime under Section 36.03(a)(1). Indeed, when the defendant is himself or herself a public

servant (i.e., "a member of the governing body of a governmental entity") and the defendant takes "official action" that "influences or attempts to influence a public servant" (i.e., the alleged victim of the "coercion"), there is no crime under Section 36.03(a)(1). The statutory exception negates the State's argument here that the Legislature was attempting to limit its own speech. But even if the State's explanation were not so obviously wrong on so many levels, the State never explains how the Legislature, under the guise of "regulating its own speech," could abrogate *individual* members' constitutional rights (much less those of anyone else).

## IV. Reply to the State's Arguments that the Face of the Statute Is Not Overbroad.[6]

In responding to Governor Perry's overbreadth arguments, the State initially relies on *Duncantell*, discussed above, to argue that a statute cannot be overbroad if the defendant is entitled to no constitutional protection. St.Br. at 14. As discussed above, this argument lacks any merit.

The State also claims that even though Section 36.03(a)(1) and Section 1.07(a)(9)(F) are content-based restrictions on speech, the presumption of constitutionality applies because "regulating coercive threats by public officials is distinct from regulating purely political speech by private citizens." *Id.* at 14-15. This illusory distinction is built on the same false premise discussed above, that speech by a government official inherently lacks First Amendment protection. It has

---

[6] *See* State's Issue I(C)(1) at 13-19.

10

absolutely no probative value in relation to Governor Perry's facial overbreadth challenge.

The State also misstates the applicable test for Governor Perry's facial overbreadth challenge in saying that, whether his claim is based on the First Amendment or not, he "must prove that a prosecution can never be constitutionally applied to any Texas defendant charged with the statute at issue." *Id.* at 15. In other words, says the State, "if the court can identify any factual circumstances in which the statute is valid, the facial challenge must fail." *Id.* The State is wrong; this is a First Amendment challenge and the chilling effect of an overbroad restriction justifies the invalidation of a statute if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (internal quotation marks omitted)); *see also* App.Br. at 9.

After misstating the proper test, the State tenders five "hypothetical factual circumstances" in an effort to demonstrate the statute's lack of overbreadth. St.Br. at 15-16. These "hypotheticals" have no bearing on the overbreadth of Section 36.03(a)(1) and Section 1.07(a)(9)(**F**), because, even if a statute happens to have a few valid applications, the proper test requires an examination of whether the statutory language sweeps up a substantial amount of protected speech. The

11

statutory language at issue is in no way narrowly tailored to prohibit only unprotected speech, and the State never argues otherwise. In any event, and for any number of reasons, while some of the hypotheticals appear to violate various statutes, none actually reflects a violation of the provisions at issue here—Section 36.03(a)(1) and Section 1.07(a)(9)(F)—even disregarding the statutory exception of Section 36.03(c). The first three potentially reflect violations of Section 36.04 (the improper influence statute) and Section 39.03 (the official oppression statute), while the last two do not reflect a violation of any criminal statute.

## V. Reply to the State's Arguments On Strict Scrutiny Review.[7]

The State suggests that strict scrutiny is inapplicable because "only content-based regulation on *private citizen's speech* would be held presumptively invalid and subject to strict scrutiny." St.Br. at 19-20 (emphasis in original). This argument again draws upon the inaccurate premise that, despite prosecuting Governor Perry as an individual, his speech was "employee" or "government" speech outside the purview of the First Amendment. Furthermore, the State does not address the fact that Section 36.03(a)(1) and Section 1.07(a)(9)(F) prohibit threats with a certain content and are thus plainly content-based restrictions. In fact, the State's assertion that Section 36.03 "only criminalizes two categories of coercion—physical threats and *threats of official action*," St.Br. at 22 (emphasis

---

[7] *See* State's Issue I(C)(2) at 19-21.

12

added), essentially admits that the statute is content based.

## VI. Reply to the State's Arguments Regarding "Least Restrictive Means" of Serving a Compelling State Interest.[8]

The State does not directly respond to Governor Perry's arguments that Section 36.03(a)(1) and Section 1.07(a)(9)(F) are not the least restrictive means of serving a compelling state interest. *See* App.Br. at 17-22. Rather, it argues by analogy to extortion that "Texas has a singular interest in intervening when public officials try to leverage the power of government for their personal or political whims." St.Br. at 21.

But other statutes criminalize the factual scenarios (i.e., hypotheticals) that the State believes are covered by Section 36.03(a)(1) and Section 1.07(a)(9)(F). *See id.* at 15-16. This only further illustrates that Section 36.03(a)(1) and Section 1.07(a)(9)(F) cannot be the least restrictive means for accomplishing the State's purpose.

Additionally, the State asserts that the statutory language merely prohibits "physical and legal coercion," which it claims can be constitutionally prohibited under *United States v. Kozminski*, 487 U.S. 931 (1988). But the State never explains how the statutory language can be construed as limited to "physical or legal coercion." *Kozminski* certainly does not stand for that proposition. It holds only that the Thirteenth Amendment's definition of "involuntary servitude"—which would be

---

[8] *See* State's Issue I(C)(2) at 21-22.

13

applied to two federal criminal statutes, 18 U.S.C. Section 241 (conspiracy against rights) and 18 U.S.C. Section 1584 (the involuntary servitude statute)—includes work forced upon a person by "physical or legal coercion."[9]

The definition of "coercion" under Section 36.03(a)(1) and Section 1.07(a)(9)(F) is far broader than the coercion barred by the Thirteenth Amendment. *Kozminski* lends no support to the State's argument that these Texas statutes are the least restrictive means to achieve a compelling legislative purpose consistent with the First Amendment.[10]

---

[9] Even less persuasive is the State's reliance on Justice Brennan's concurring opinion in *Kozminski*, which contained the proposed holding—explicitly rejected by the full Court—that the term "involuntary servitude" should include "*any means of coercion* that actually succeeds in reducing the victim to a condition of servitude resembling that in which slaves were held before the Civil War." *Kozminski*, 487 U.S. at 950 (emphasis added; internal quotation marks omitted).

[10] Significantly, the *Kozminski* Court carefully preserved ample space for free speech by greatly limiting what counted as "legal coercion" for purposes of the Thirteenth Amendment and the two statutes involved. The Court rejected the government's argument that a broad construction of "involuntary servitude" should be adopted that would "prohibit the compulsion of services by any means that, from the victim's point of view, either leaves the victim with no tolerable alternative but to serve the defendant or deprives the victim of the power of choice." *Kozminski*, 487 U.S. at 949. According to the Court, under the government's proposed interpretation, "involuntary servitude would include compulsion through psychological coercion as well as almost any other type of speech or conduct intentionally employed to persuade a reluctant person to work." *Id.* The Court stated that the government's proposed interpretation "would appear to criminalize a broad range of day-to-day activity," including "a parent who coerced an adult son or daughter into working in the family business by threatening withdrawal of affection," as well as "a political leader who uses charisma to induce others to work without pay." *Id.* According to the Court, the government's hypotheticals "suggest" that its proposed construction would "delegate to prosecutors and juries the inherently legislative task of determining what type of coercive activities are so morally reprehensible that they should be punished as crimes," and "would also subject individuals to the risk of arbitrary or discriminatory prosecution and conviction" while "fail[ing] to provide fair notice to ordinary people who are required to conform their conduct to the law." *Id.*

14

**VII.** **Reply to the State's Arguments on Facial Vagueness.**[11]

The State's response to Governor Perry's facial vagueness challenge contains two propositions: (1) *State v. Hanson*, 793 S.W.2d 270 (Tex. App.—Waco 1990, no pet.), relied upon by Governor Perry, is distinguishable; and (2) the Legislature intended the statute to criminalize threats of lawful action due to the insertion and subsequent deletion of the requirement that the threat be "unlawful." St.Br. at 24-30. These arguments lack merit.

The State's contention that *Hanson* is distinguishable because Governor Perry allegedly did not have the "legal authority to demand an elected district attorney's resignation," St.Br. at 25, is short of the mark for multiple reasons. The State cites no authority for its bald assertion that a Governor cannot call for any elected official to resign. Indeed, it is beyond dispute that anyone, whether a private citizen or an elected public servant, has an unfettered First Amendment right to call for the resignation of any elected public servant. The State's contrary position demonstrates the broad, chilling effect of its interpretation: no one in government—indeed no one at all—could call for the resignation of an elected official unless he or she has the right to remove that elected public official from office, which is a power rarely if ever in the possession of those who demand resignations. If in fact Governor Perry did call for Lehmberg's resignation, that

---

[11] *See* State's Issue II at 23-30.

would have been entirely appropriate, given Lehmberg's egregious conduct, the Legislature's response, the public debate regarding her potential resignation, and the pendency of the removal lawsuit(s) filed against her. These are core political issues, and merely voicing one's views on such matters in an effort to produce a political result cannot be a criminal act in any true democracy, much less one governed by the First Amendment.

But the very premise of the State's purported distinction also fails. Judge Hanson, as a county judge, had no authority on her own to terminate the county's funding of the salaries of a deputy district clerk and an assistant district attorney. Thus, the State's test cannot even explain the result in *Hanson*, much less distinguish it from this case. In fact, that test has the opposite effect, as here Governor Perry had the unfettered right to veto funding for the PIU. Rather, Judge Hanson's threat to terminate the county's funding of the two positions was an effort to coerce: (a) the district judge into firing the county auditor; and (b) the country attorney into revoking a misdemeanant's probation—two actions which she did not have the authority to take herself. The State's effort to distinguish *Hanson*, even disregarding the State's utilization of the incorrect vagueness standard, wholly lacks merit.

The State's second assertion, that the Legislature intended to allow threats of *lawful* action to be criminalized under Section 1.07(a)(9)(F), also fails. While it is true that the term "unlawful" was included and then subsequently omitted from the

16

definition of "coercion," the State's assertion of the legislative purpose is based solely on speculation about a change that occurred at conference committee as one small part of a massive overhaul of the Penal Code. Nothing in any testimony or written bill analysis makes the State's hypothesis about the members' motives any more likely than the hypothesis that the word "unlawful" was simply omitted by oversight when the conference committee rejected the House's new approach.[12]

As argued by Governor Perry, the case law is clear that a threat to do what one has a legal right to do cannot even constitute duress, and thus would not fall within the definition of "unlawful." App.Br. at 25-26. So even if the State is correct that the word "unlawful" was intentionally omitted at conference committee, it cannot be concluded that the Legislature intended the statute to cover non-tortious conduct.[13] Rather, the omission of the requirement that the threat be "unlawful" serves to demonstrate the extreme overbreadth of the statute as well as its insoluble vagueness, as no individual is placed on notice that Section 36.03(a)(1) and Section 1.07(a)(9)(F) criminalize otherwise "lawful" threats.

---

[12] The definition of "coercion" was originally a portion of Section 36.03, but it was subsequently moved to Section 1.07 so that it would be applicable to all crimes in the Penal Code that include or rely upon a definition of "coercion," such as theft.

[13] This follows because "unlawful" under Section 1.07(a)(48) includes "tortious conduct," including what would be tortious "but for a defense not amounting to justification or privilege." Obviously, the term "unlawful" does not cover "lawful" conduct.

17

## VIII. Reply to the State's Arguments on the Cognizability of Governor Perry's Constitutional Arguments.[14]

The State responds that "evidence" must be presented at a trial on the merits before any court can address Governor Perry's constitutional claims. St.Br. at 31. But whether the State chooses to address them or not, numerous cases compel the conclusion that his constitutional claims are cognizable and currently ripe for adjudication. The State never responds to Governor Perry's arguments that his separation of powers, Speech or Debate, and legislative immunity challenges all involve a right *not to be tried* which can only be vindicated before trial occurs. App.Br. at 35-37.[15]

Judge Richardson, at the State's urging, followed a rigidly mechanical approach, reasoning that because Governor Perry conceded that the coercion statutes can in some circumstances and in conjunction with some definitions be constitutional, it follows that his constitutional rights cannot be vindicated short of a full trial on the merits. But Governor Perry in no way "conceded himself" out of court, because his complaints here—all of which can be decided based on the face of

---

[14] *See* State's Issue III at 31-43.

[15] Even when the State does address Governor Perry's authorities, it does so without probative force. For instance, in attempting to distinguish *Ex parte Boetscher*, 812 S.W.2d 600 (Tex. Crim. App. 1991), St.Br.at 33-34, the State fails to acknowledge that the *Boetscher* court relied upon the facts alleged in the indictment to resolve the issues raised in the pretrial writ of habeas corpus and, based on the statute and the indictment facts, ordered the indictment dismissed. *See* 812 S.W.2d at 604. Also, *Boetscher* explicitly reserved for another day the question of the statute's constitutionality as applied to a different set of facts, the hallmark of an as-applied challenge. *See id*. at 604 n.8.

the indictment—are not true "as applied" challenges.[16]

Three critical principles, to which the State tellingly never responds, compel the conclusion that all of Governor Perry's issues are cognizable. These are: the absence of an adequate remedy of law in light of his claims seeking to prevent a trial; that a favorable resolution by the court would result in the immediate release of Governor Perry from his illegal restraint; and that the current resolution of his issues would certainly result in judicial economy. *See* App.Br. at 32, 35-37 (citing, in particular, *Helstoski v. Meanor*, 442 U.S. 500 (1979)).

Additionally, the State's insistence that "the resolution of [these claims] may be aided by the development of a record at trial," St.Br. at 37, ignores common sense. If the statutes and indictment currently demonstrate that the prosecution is unconstitutional and should be barred, the "development of a record at trial" can make the prosecution no less deficient—indeed, a trial would only exacerbate the violation of Governor Perry's constitutional rights. The law requires that "everything should be stated in an indictment which is necessary to be proved." Tex. Code Crim. Proc. art. 21.03.

The State's effort to deflect Governor Perry's argument that his claims are the

---

[16] The State fails to address the language of *Karenev v. State*, 281 SW.3d 428, 435 (Tex. Crim. App. 2008), which directly supports the proposition that Governor Perry's claims are not true "as applied" challenges. Governor Perry made this proposition clear in his application for writ, CR41, in his reply to the State's answer to his writ, CR417-419, and in his brief to this Court. App.Br. at 34.

19

functional equivalent of facial attacks again fails to address the policy considerations noted above. *See* St.Br. at 37-43. More importantly, the State's reliance on *Ex parte Ragston*, 402 S.W.3d 472 (Tex. App.—Houston [14th Dist.] 2013), *aff'd on other grounds sub nom.*, *Ragston v. State*, 424 S.W.3d 49 (Tex. Crim. App. 2014), is completely misplaced. Although the defendant could not constitutionally be sentenced to death because he was under eighteen years of age at the time he allegedly committed the murder, the court correctly noted that Ragston made no challenge to the capital murder statute under which he was charged. 402 S.W.3d at 476. His constitutional challenge to the potential punishment would arise only if and when he was convicted and the death sentence imposed. *Id*. Thus, his claim, "even if successful, would not result in [his] immediate release because it is directed to the sentence to be imposed after conviction, not the validity of the present indictment." *Id*. (citing *Ex parte Doster*, 303 S.W.3d 720, 724 (Tex. Crim. App. 2010)). He would then have the opportunity for a full, adequate, and timely remedy on direct appeal. Thus, the *Ragston* court properly sustained the State's challenge to the cognizability of his constitutional issue.

The State also asserts that "[t]hirty years ago, lawyers for Jim Mattox advanced the same arguments as [Governor Perry] now urges" and that this Court "summarily dismiss[ed]" the appeal. St.Br. at 40. But that case strongly supports this Court's authority to reach Governor Perry's present claims.

20

First, the Court did not "summarily dismiss" the appeal; rather, it denied relief on claims that were materially different from what Governor Perry raises. Mattox's first two appellate issues, which the Court "overrule[d]," "were that the indictments were fundamentally defective." *Ex parte Mattox*, 683 S.W.2d 93, 95-96 (Tex. App.—Austin 1984, pet. ref'd). This Court relied upon a long line of cases that habeas corpus is not available to test the sufficiency of the charging instrument. *Id*. at 96.

Second, even as it overruled Mattox's first two claims, this Court affirmatively acknowledged its authority to consider and grant habeas relief upon *a challenge to the legal authority of the State to prosecute the accused*. *Id*. This is exactly the challenge that Governor Perry has made.

Third, this Court in fact *did* examine the merits of Mattox's third and fourth issues, which challenged the constitutionality of the commercial bribery statute as "vague on its face and as applied to the facts alleged in the indictment." *Id*. Both challenges were overruled, but only after the Court addressed the arguments and stated the following regarding Mattox's "as applied" contention. As the Court explained with regard to the fourth issue:

> For one lawyer to offer another lawyer an economic benefit in consideration for the latter's breach of a fiduciary duty owed to a client is not a legitimate negotiating tactic; it is bribery. *It is just such conduct that has been alleged against Mattox in the indictments pending against him*.

21

*Id.* at 98 (emphasis added). Contrary to the State's argument, there was no "summary dismissal" on the ground that the issues were not cognizable in pretrial habeas, and this Court should likewise reach Governor Perry's challenges to the State's legal authority to prosecute him.

Finally, as to Count I, the State contends that "[t]here are limitless ways in which a public servant may use government property in unauthorized way [sic]. In this case, the State will prove that a coercive threat followed by a retaliatory action constitutes both Coercion of a Public Servant and Abuse of Office." St.Br. at 43-43. Governor Perry is at a loss to understand how this statement has any impact on the cognizability of his constitutional claims. The "government property" to which the State refers is the gubernatorial right to veto an item of appropriation. *See* March 2, 2015 SuppCR at 4 (the State's so-called "bill of particulars"). Whether an intangible right can form the basis of the abuse of official capacity statute has been raised by Governor Perry but not yet addressed or resolved by Judge Richardson, and has no bearing upon this appeal or the cognizability of Governor Perry's constitutional issues.

## IX. Reply to the State's Arguments Regarding Separation of Powers.[17]

The State's responses to Governor Perry's Separation of Powers challenge, App.Br. at 38-45, fundamentally misapprehend that challenge. Governor Perry does

---

[17] *See* State's Issue IV at 43-48.

not seek "two extensions of law," does not "ask[] that this court grant him more power," and most assuredly does not argue that the Governor "is the most powerful branch" of Texas' government. St.Br. at 43. Quite the contrary, Governor Perry merely relies on Article II, Section I of the Texas Constitution, which mandates a clear separation of powers between the three departments of state government, and well-established case law setting forth the appropriate legal test to ascertain whether a statute violates it. App.Br. at 38-40. That includes two cases where violations of the Separation of Powers Clause have been considered *in pretrial habeas cases*. *Id.* at 40.

No mere statute can criminalize a governor's exercise of his Article IV, Section 14 veto power. The *Texas Constitution* gives the governor that right, just as it provides the remedy for the misguided use of that veto: the legislative override and impeachment.

The State claims that Governor Perry believes "he could never be prosecuted for a threat or promise made in connection with his power to veto," which "surely . . . . cannot be true. *Otherwise, every bribery or extortion prosecution would be barred by the separation of powers doctrine.*" St.Br. at 44 (emphasis added). Of course, Governor Perry has advanced no such proposition. Neither count of the indictment alleges bribery. And an act of bribery can be prosecuted under the appropriate provision of the Texas Penal Code, as expressly provided by

23

Article XVI, Section 41 of the Texas Constitution. *See Mutscher v. State*, 514 S.W.2d 905, 914-15 (Tex. Crim. App. 1974). But allowing a criminal prosecution of a political decision constitutionally committed to a particular branch of government, including the discretionary decision to veto an item of appropriation, impermissibly violates the Separation of Powers Clause.

## X.    Reply to the State's Arguments on Speech or Debate and Absolute Legislative Immunity.[18]

The State argues that Texas's Speech or Debate Clause and the related doctrine of absolute legislative immunity provide no protection to Governor Perry (or any Texas governor) because: (1) the Texas Speech or Debate Clause is narrower than the federal Speech or Debate Clause; (2) the Texas Speech or Debate Clause only applies to members of the Legislature; (3) the Texas Speech or Debate Clause does not protect all legislative speech; and (4) legislative immunity does not bar criminal prosecution. St.Br. at 48-60. None of these arguments have merit.

### A.    The State Mischaracterizes *Mutscher v. State*

Contrary to the State's assertion, *Mutscher v. State*, 514 S.W.2d 905 (Tex. Crim. App. 1974), did not hold that the Texas Speech or Debate Clause is narrower than its federal counterpart, and other cases have confirmed that it is not.[19] Nor did

---

[18] *See* State's Issue V at 48-60.

[19] *See Canfield v. Gresham*, 17 S.W. 390, 392-93 (Tex. 1891) (*citing Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880)); *Bowles v. Clipp*, 920 S.W.2d 752, 758 (Tex. Civ. App.—Dallas 1996, writ denied); *see also Tenney v. Brandhove*, 341 U.S. 367, 375 (1951) (noting common purpose of Texas and federal Speech or Debate Clauses).

24

*Mutscher* explicitly reject the broad application of the Speech or Debate Clause advanced by the U.S. Supreme Court.

*Mutscher* involved a conspiracy where two legislators "accept[ed] a bribe with the understanding that [they] would use their vote, influence and powers of their office to procure and assist in the passage of certain legislation." 514 S.W.2d at 909. The then-current bribery statute applied to "[a]ny legislative, executive or judicial officer" who accepted or agreed to accept a "bribe" for any "act, vote, opinion or judgment" regarding something that might be brought before him in his official capacity. *Id.* at 914-15. The indictment alleged in rich factual detail how the legislators accepted bribes from a bank in exchange for procuring and attempting to procure legislation for the bank's benefit. *Id.* at 914.

*Mutscher* held that the bribery prosecutions did not violate the Texas Speech or Debate Clause for two reasons: (1) because the Texas Constitution contains a "specific mandate" for bribery prosecutions of public officials (Article XVI, Section 41), which "is not in conflict with" Texas's Speech or Debate Clause, *id.* at 915; and (2) because "[t]aking a bribe is obviously no part of the legislative process or function; it is not a legislative act." *Id.* at 915 (quoting *Brewster*, 408 U.S. at 501). Thus, far from "explicitly reject[ing] the broad application of the Speech or Debate Clause as advanced by the U.S. Supreme Court," St.Br. at 51, *Mutscher* in fact *embraced* federal authority on that provision.

25

Unlike in *Mutscher*, the indictment against Governor Perry contains no allegation of bribery, nor that Governor Perry obtained *anything* from his actions. Unlike in *Mutscher*, where the bribe was not part of the legislative process, Governor Perry's approval or veto is expressly authorized by the Constitution as an essential step in the legislative process. The indictment itself makes this clear. Count I is based solely on Governor Perry's exercise of his constitutional veto power. Count II is based on an allegation that Governor Perry's intention to exercise his constitutional veto power was communicated to Lehmberg as a "threat." Neither count remotely alleges bribery. As such, the Texas Constitution's authorization of bribery prosecutions in Article XVI, Section 41 is irrelevant to this indictment or prosecution, and *Mutscher* offers the State no aid.

## B. Texas's Speech or Debate Clause Does Not Apply Only to Members of the Legislature

The State also asserts that the protections of the Texas Speech or Debate Clause only apply to members of the Legislature, not to the Governor. St.Br. at 53-55. But the State is wrong; it ignores a century of authoritative case law holding that governors act in a *legislative* capacity when exercising their constitutional veto. *See* App.Br. at 41, 47.

Moreover, Texas governors are not detached legislative gatekeepers, but active participants in legislative discourse. Governors are constitutionally required to "recommend to the Legislature such measures as [they] may deem expedient,"

26

Tex. Const. art. IV, § 9, and to explain their objections to bills when exercising the veto power. *Id.* § 14. In short, not only does it *permit* communication, the Texas Constitution *requires* communication between the Governor and legislators as an integral part of the legislative process. Such communication contributes to both sound policymaking and an informed electorate.

The State also ignores cases cited by Governor Perry, App.Br. at 47-48, addressing the scope of legislative immunity, which "derives largely from the Speech and Debate Clauses of the Texas and federal constitutions." *In re Perry*, 60 S.W.3d 857, 859 (Tex. 2001). While Texas is not bound by federal practice with respect to the Speech or Debate Cause, Texas courts have chosen to follow analogous federal authority regarding this clause, like many others. App.Br. at 47-48 (collecting cases).

The State attempts to undermine this authority with two inapposite cases. In the first, Governor Marvin Mandel of Maryland was denied the protection of legislative immunity because, in the eyes of one federal judge, a governor's "criminal prosecution *by his own branch* . . . simply does not pose the separation of powers conflict that is the basis for the immunity." *United States v. Mandel*, 415 F. Supp. 1025, 1031 (D. Md. 1976) (emphasis added). But the structure of Texas government is very different from Maryland's: our executive is divided, and prosecutors are members of the *judicial* branch, and not accountable to the governor.

27

*See Saldano v. State*, 70 S.W.3d 873, 876 (Tex. Crim. App. 2002). Moreover, since *Mandel* was decided in 1976, several federal circuits have held that governors *are* protected by absolute legislative immunity for their legislative acts. *See State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 91-92 (2d Cir. 2007); *Baraka v. McGreevey*, 481 F.3d 187, 196-97 (3d Cir. 2007); *Torres Rivera v. Calderon Serra*, 412 F.3d 205, 212-14 (1st Cir. 2005); *Women's Emergency Network v. Bush*, 323 F.3d 937, 950 (11th Cir. 2003). In the second case cited by the State, Governor Rod Blagojevich was denied the protection of Illinois's Speech or Debate Clause in a suit against him in his *official capacity* for declaratory and injunctive relief—a class of cases wholly distinct from the prosecution here. *See Empress Casino Joliet Corp. v. Blagojevich*, 638 F.3d 519, 528 (7th Cir. 2011) (citing *Jorgensen v. Blagojevich*, 811 N.E.2d 652, 654-59 (Ill. 2004)), *rehearing en banc granted, vacated on other grounds*, 651 F.3d 722 (7th Cir. 2011). While the Seventh Circuit had no opportunity to consider immunity from criminal prosecution, the court nevertheless acknowledged the former governor's entitlement to absolute legislative immunity under federal law from *personal civil liability*. 638 F.3d at 530-32.

C. **Governor Perry's Alleged Conduct Was All Legislative in Nature**

The State argues that any communication with a governor is not "an 'essential part' of the process of a bill becoming a law" and thus is not entitled to Speech or Debate Clause protection. St.Br. at 55-56. But as noted in the preceding subsection

28

of this reply, the Texas Constitution does in fact make communications with the governor an essential part of the legislative process. *See* Tex. Const. art IV, § 9 (governor "shall recommend to the Legislature such measures as he may deem expedient"); *id.* § 14 (governors must explain their objections to bills when exercising the veto power).

The State misunderstands the distinction between the governor's role in legislating and his role in enforcing the law. A governor's administration of a statute *after* enactment, depending on the circumstances, may not be protected by the Clause, but the "deliberative and communicative processes" involved in "the consideration and passage or rejection of proposed legislation" fall squarely within the ambit of the Clause. *Gravel v. United States*, 408 U.S. 606, 625 (1972). And one such "deliberative and communicative process" is the expression by legislators and governors of their intention to vote or veto a certain way. The State would have the Court believe that even legislators are vulnerable to prosecution every time they take a position on a bill prior to a formal vote. But legislating is a clash between competing positions and intentions, not a university seminar exploring abstract policy questions. The Speech or Debate Clause recognizes this practical reality. *See Hutchinson v. Proxmire*, 443 U.S. 111, 124 (1979) (observing that "the Court has given the Clause a practical rather than a strictly literal reading" in order to further its core purpose of protecting the legislative process).

29

**D.** **The State Misstates Federal Law Regarding the Effect of Legislative Immunity**

The State's final argument is that legislative immunity merely applies to civil suits, not criminal prosecutions. St.Br. at 58-60. But as the cases cited by Governor Perry demonstrate, many state courts have applied legislative immunity to bar both civil and criminal proceedings. App.Br. at 49. As these courts have recognized, the "level of intimidation against a local legislator arising from the threat of a criminal proceeding is at least as great as the threat from a civil suit." *State v. Holton*, 997 A.2d 828, 856 (Md. Ct. Spec. App. 2010), *aff'd*, 24 A.3d 678 (Md. 2011). Indeed, the decision in *United States v. Mandel*, 415 F. Supp. 1025 (D. Md. 1976), upon which the State so heavily relies, St.Br. at 53, is directly contrary to the State's position at pages 58-60 of its brief. *Mandel* notes that "[t]he various state and federal provisions guaranteeing freedom of speech and debate in the legislature are specific codifications of the common law doctrine of legislative immunity," and acknowledges that the "doctrine has both substantive and evidentiary aspects." *Id.* at 1027. It then states that "[t]he substantive aspect of the doctrine affords legislators *immunity from both civil and criminal liability* arising from legislative acts such as speech or debate in legislative proceedings," citing nine Supreme Court cases and four other federal or state cases. *Id.* at 1027 n.1 & 2 (emphasis in original).

Instead of candidly acknowledging that language from a case the State itself invokes, the State cites snippets from federal cases that leave an incomplete, if not

30

misleading impression. Although the U.S. Supreme Court did say in *Gravel* that the federal Speech or Debate Clause "does not purport to confer a *general* exemption upon Members of Congress from liability for process in criminal cases," St.Br. at 58 (quoting *Gravel*, 408 U.S. at 627) (emphasis added), the Court also observed that the Clause provides a *specific* exemption that "protects Members against prosecutions that directly impinge upon or threaten the legislative process." 408 U.S. at 616; *see also Johnson*, 383 U.S. at 184-85 ("[P]rosecution under a general criminal statute dependent on such inquiries [into legislative speech or its preparation] necessarily contravenes the Speech or Debate Clause."). And in the State's three other cases, St.Br.at 58-59 (quoting *United States v. Gillock*, 445 U.S. 360, 371-72 (1980); *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976); *O'Shea v. Littleton*, 414 U.S. 488, 503 (1974)), all the Court addressed was whether a *state* official was immune from *federal* criminal prosecution—a straightforward application of the U.S. Constitution's Supremacy Clause, which is irrelevant when a *state* official is subjected to a *state* criminal prosecution.

## CONCLUSION

For all the reasons given above and in his opening brief, Governor Perry respectfully prays that this Court reverse the district court's denial of relief, sustain the constitutional issues raised in his Application, and bar trial on both counts of the indictment and/or dismiss both counts of the indictment. Governor Perry further

31

prays for any other relief to which he may be entitled.

Respectfully submitted,

THE BUZBEE LAW FIRM            BAKER BOTTS L.L.P.

_/ s / Anthony G. Buzbee_            _/ s / Thomas R. Phillips_
Anthony G. Buzbee                  Thomas R. Phillips
State Bar No. 24001820             State Bar No. 00000102
JPMorgan Chase Tower               98 San Jacinto Blvd., Suite 1500
600 Travis Street, Suite 7300      Austin, Texas 78701-4078
Houston, Texas 77002               Telephone:  512.322.2565
Telephone:  713.223.5393           Facsimile:   512.322.8363
Facsimile:   713.223.5909          tom.phillips@bakerbotts.com
Tbuzbee@txattorneys.com


BOTSFORD & ROARK

_/ s / David L. Botsford_
David L. Botsford
State Bar No. 02687950
1307 West Avenue
Austin, Texas 78701
Telephone:  512.479.8030
Facsimile:   512.479.8040
dbotsford@aol.com

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this document contains 7,028 words in the portions of the document that are subject to the word limits of Texas Rule of Appellate Procedure 9.4(i), as measured by the undersigned's word-processing software.

*/ s / David L. Botsford*
David L. Botsford

**CERTIFICATE OF SERVICE**

This is to certify that a true and complete copy of this document has been emailed to Mr. Michael McCrum at michael@McCrumlaw.com and to Mr. David Gonzalez at david@sg-llp.com on April 9, 2015, the date that it was electronically filed with the Clerk of the Court.

*/ s / David L. Botsford*
David L. Botsford